## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| QUANTUM-SI INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>MOHAMMAD "WADUD" BHUIYA,<br><br>Defendant. | CIVIL ACTION<br>NO.: _____ |

## VERIFIED COMPLAINT

Plaintiff Quantum-Si Incorporated ("Quantum-Si" or "Plaintiff") files this Verified Complaint against Defendant Wadud Bhuiya ("Bhuiya" or "Defendant"). In support of this Verified Complaint, Quantum-Si states as follows:

## NATURE OF THE CASE

1.      This is an action for breach of contract, breach of duty of loyalty, and misappropriation of trade secrets for which Quantum-Si seeks damages, a permanent injunction, and its attorneys' fees.

2.      Quantum-Si, founded in 2013, is a biotechnology company that specializes in the development of semiconductor technology for use in protein sequencing.

3.      Bhuiya, is a veteran scientist who joined Quantum-Si in 2015. Nearly two months before his abrupt resignation and departure from Quantum-Si, Bhuiya accepted an offer from one of Quantum-Si's competitors, Encodia, Inc. ("Encodia"). After Bhuiya accepted Encodia's offer, he feigned a work justification for traveling Quantum-Si's San Diego office. There, he met with and collected confidential information regarding other Quantum-Si scientists' research for the

benefit of his new employer – all while traveling on Quantum-Si's expense. This conduct constituted a breach of his fiduciary duties.

4.      On his final day of employment, Bhuiya did not disclose he would be working for a competitor. He began working for Encodia just four days after he left Quantum-Si – performing the same role as at Quantum-Si – in breach of his contractual non-compete obligations. The night before his final day of employment at Quantum-Si, Bhuiya used a personal MacBook laptop to access critical files containing his colleagues' reports from Quantum-Si's most recent experiments, despite no longer having a legitimate work reason to do so. Bhuiya's improper acquisition of these critical files for use outside of the scope of his employment constituted a violation of federal and Connecticut trade secrets laws. He then breached his contractual obligation to turn over these and other copies of Quantum-Si documents on his MacBook, on his iPhone, and at his home.

5.      Quantum-Si did not learn that Bhuiya had gone to work for Encodia until Bhuiya publicly announced the move on a May 2, 2023 LinkedIn post. The post revealed that Bhuiya was working on the very same technology he had helped develop at Quantum-Si. At the present time, Encodia has not yet gone to market with this technology. Bhuiya's inevitable disclosure of Quantum-Si's confidential research data, use of specific documents taken from Quantum-Si, and work performed in competition with Quantum-Si, will – unless remedied by this court – save Encodia tens of millions of dollars in research and development costs, at Quantum-Si's expense.

## **PARTIES**

6.      Quantum-Si Incorporated is a Delaware corporation with its principal place of business in Connecticut.

7.      Mohammad "Wadud" Bhuiya is a citizen and resident of California.

2

## JURISDICTION AND VENUE

8.     This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1). There is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.     This Court also has federal subject matter jurisdiction over Plaintiff's claim under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 et seq., pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state law claims because all claims are based on a common nucleus of operative fact and all claims form part of the same case or controversy

10.     This Court has personal jurisdiction over Defendant because he contractually agreed to the exclusive jurisdiction of the United States District Court for the District of Connecticut sitting in New Haven County, and because his intentional and unlawful conduct took place in Connecticut, where he then resides, and was and is calculated to harm Plaintiff in Connecticut.

11.     Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district.

12.     Venue is also proper within this judicial district pursuant to 28 U.S.C. § 1391(b)(3) because Plaintiff is subject to personal jurisdiction in this district.

## ALLEGATIONS

### The Business of Quantum-Si

13.     Quantum-Si is in the business of researching, developing, and marketing protein sequencing technology. It was founded in 2013 and became a publicly-traded company in June 2021.

14.     The Company's suite of technologies is powered by a first-of-its-kind semiconductor chip designed to enable single-molecule next-generation protein sequencing and digitize proteomic research in order to advance drug discovery and diagnostics beyond what has been possible with DNA sequencing. Quantum-Si's proprietary amino acid recognizers deliver industry leading coverage of the human proteome (the entire complement of proteins that can be expressed by an organism), and its continued research and development efforts are aimed at achieving greater than 70% coverage.

15.     Quantum-Si launched its first commercially available product, Platinum, in December 2022. There is no comparable product in the market today.

16.     Quantum-Si has just a few existing competitors for next-generation protein sequencing technology in the market today. Its primary competitors are Encodia and Erisyon, and neither has yet to commercially release any product to the market.

**Quantum-Si's Efforts to Protect Its Trade Secrets and Confidential Information**

17.     Quantum-Si has invested considerable time, expense, and resources in its science professionals, including Bhuiya during his employment, so that they can perform their work for Quantum-Si competently and successfully.

18.     Quantum-Si maintains trade secrets that are valuable, confidential, and proprietary to Quantum-Si, and that are not generally known in the public domain, including the experimental data on effective protein binders generated and analyzed by the research team of which Bhuiya was a part, the library of effective protein binders compiled to date, and the technical know-how arriving at optimal results in multiple classes of experiment.

19.     Through their work, Quantum-Si's science professionals, including Bhuiya, gain detailed and intimate knowledge of Quantum-Si's trade secrets and other confidential information.

20.     Quantum-Si's trade secrets, confidential information, and business relationships have significant economic value to the Company. Quantum-Si has a legitimate business interest in keeping such information confidential and not allowing its trade secrets and other confidential information to be disclosed to its competitors through any improper means.

21.     Quantum-Si's trade secrets and confidential information would be of significant economic value to the Company's competitors.

22.     Consequently, Quantum-Si takes the protection of its information very seriously and expends a considerable amount of time and money to keep its information secure. At all relevant times, Quantum-Si has taken extensive and reasonable steps to protect the confidentiality of its trade secrets and other confidential information. This includes:

(a)     Requiring an Access Badge or Keys to get in and around Quantum-Si's facilities;

(b)     Storing Quantum-Si's confidential information on secured and password-protected computer systems, which require multi-factor authentication and are accessible only to Quantum-Si personnel;

(c)     Ensuring that employee account creation and permission levels are restricted to only the resources absolutely needed to perform each employee's job duties. When a user's role within the organization changes, those accounts and permission levels are changed/revoked to fit the new role and disabled when the user leaves the organization altogether.

(d)     Quantum-Si's Noncompetition, Confidentiality and Intellectual Property Agreement, which it requires all employees to sign as a condition of employment, contains confidentiality and non-disclosure provisions, as well as provisions requiring the return of company property (including confidential information) to Quantum-Si at the end of an individual's employment (and the Employee Handbook required the same).

**Bhuiya's Acceptance of Employment with Quantum-Si.**

23.     Quantum-Si made Bhuiya a written offer of employment on December 26, 2014, setting forth the terms of conditions of his employment at Quantum-Si. Bhuiya signed the offer letter that day.

24.     Bhuiya held the role of Principal Scientist based out of Quantum-Si's principal laboratories in Guilford, Connecticut, earning a six-figure base salary.

25.     Bhuiya commenced his employment at Quantum-Si on February 11, 2015. At the time he was among Quantum-Si's first 25 employees.

**Bhuiya's Noncompetition, Confidentiality and Intellectual Property Agreement**

26.     Bhuiya was required, in consideration of this offer of employment, to sign a Noncompetition, Confidentiality and Intellectual Property Agreement (the "Agreement").

27.     Bhuiya did sign the Agreement, which had an effective date of January 8, 2015.

28.     Section 1(b)(ii) of the Agreement contains a non-competition provision that provides, in pertinent part:

> During the period in which you perform services for or at the request of the Company (the "Term") and for a period of one (1) year following termination of the Term, whether such termination is voluntary or involuntary, you shall not, without the prior written consent of the Company, . . . either as principal, agent, stockholder, employee, consultant, representative or in any other capacity, . . . be concerned, connected or employed by, or otherwise associate in any manner with, . . . any business which is directly or indirectly Competitive with the business of the Company within the United States of America (the "Restricted Territory") . . . .

29.     The term "Competitive" is defined in Section 1(a)(ii) of the Agreement as, in pertinent part, a business that "performs any other services and/or engages in the research or development of processes, products or techniques or the production, manufacture, distribution or

sale of any product similar to services performed or products produced, manufactured, distributed or sold by the Company during the term of your relationship with the Company."

30.    Section 1(a)(iii) contains the following acknowledgment:

> You further acknowledge and agree that, during the course of your employment with the Company, the Company will furnish, disclose or make available to you, and you may develop, confidential and proprietary information related to the Company's business. You also acknowledge that such confidential information has been developed and will be developed by or on behalf of the Company through the expenditure by the Company of substantial time, effort and money and that all such confidential information could be used by you to compete with the Company. If you were to provide services to any business which is directly or indirectly Competitive with the business of the Company, you will inevitably disclose the Company's confidential and proprietary information.

31.    In Section 1(a)(iv) of the Agreement, Bhuiya acknowledged "that the services [Bhuiya] will perform for the Company will be delivered in the State of Connecticut."

32.    Section 1(c) of the Agreement contains the following acknowledgment:

> Reasonableness of Restrictions. You further recognize and acknowledge that (i) the types of employment which are prohibited by this Section 1 are narrow and reasonable in relation to the skills which represent your principal salable asset both to the Company and to your other prospective employers, and (ii) the specific but broad geographical scope of the provisions of this Section 1 is reasonable, legitimate and fair to you in light of the Company's need to market its services and sell its products in a large geographic area in order to have a sufficient customer base to make the Company's business profitable and in light of the limited restrictions on the type of employment prohibited herein compared to the types of employment for which you are qualified to earn your livelihood.

33.    Section 2 of the Agreement contains a confidentiality and non-disclosure provision that states, in pertinent part:

> Protected Information. You shall at all times, both during and after any termination of your employment by either the Company or you, maintain in confidence and shall not, without the prior written consent of the Company, use, except in the course of performance

of your duties for the Company, disclose or give to others any fact or information which was disclosed to or developed by you during the course of performing services for, or receiving training from, the Company, and is not generally available to the public including, but not limited to, this Agreement, the terms hereof, the fact that you are working with or have had discussions with Company, technical data, trade secrets, know-how, show-how, research, product plans, products, services, customer lists and customers, markets, software, developments, Inventions (as defined in paragraph 3), processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or any other scientific, technical, trade or business information of the Company or any third party developed by you or disclosed to you by the Company either directly or indirectly in writing, orally or by drawings or observation (collectively, "Confidential Information"). . . . You agree not to make any copies of such confidential or proprietary information of the Company (except when appropriate for the furtherance of the business of the Company or duly and specifically authorized to do so) . . . .

34.     Section 3(a) of the Agreement contains a "work-for-hire" provision that provides,

*inter alia*:

All ideas, discoveries, creations, manuscripts and properties, innovations, improvements, know-how, show-how, inventions (whether patentable or not), designs, trade secrets, developments, apparatus, techniques, methods, software, source and object code, technology, biological processes, cell lines, laboratory notebooks and formulas, whether or not reduced to practice and whether or not patentable or copyrightable, which were or may be conceived, reduced to practice or developed during the Term (or if involving Confidential Information, conceived or developed during or after the Term) by you, whether alone or in conjunction with another or others, whether or not during business hours, and whether at the request or upon the suggestion of the Company, or otherwise, (all of the foregoing, as well as any related improvements, modifications or derivatives thereof, being hereinafter referred to as the "Inventions") shall be the sole and exclusive property of the Company. To the maximum extent permitted by law, the Inventions referred to in the prior sentence will be deemed "works made for hire" as the term is used in the United States Copyright Act. . . . All Inventions shall constitute the Confidential Information of the Company, subject to the protections set forth in Section 2 of this Agreement.

35.     Section 5 of the Agreement is a return provision that provides:

> <u>Records</u>. Upon termination of your relationship with the Company, you shall deliver to the Company any property of the Company which may be in your possession including products, materials, memoranda, notes, laboratory notebooks, records, reports, or other documents or photocopies of the same.

36.     Section 7(g) of the Agreement provides that the Agreement is governed by Connecticut law.

37.     In Section 7(h)(iii) of the Agreement, Bhuiya and Quantum-Si consented to the exclusive jurisdiction of the United States District Court for the District of Connecticut and the Connecticut state courts sitting in New Haven County and submitted to the personal jurisdiction of those courts.

38.     Section 7(m) provides: "Should any party breach this Agreement, in addition to all other remedies available at law or in equity, such party shall pay all of any other party's costs and expenses resulting therefrom and/or incurred in enforcing this Agreement, including legal fees and expenses."

**Bhuiya's Access to Quantum-Si's Confidential Information**

39.     Quantum-Si issued Bhuiya a company laptop to use exclusively for work purposes.

40.     Quantum-Si also provided Bhuiya with remote access to its computer servers through a virtual private network ("VPN"), so that he could perform work on his own personal MacBook computer.

41.     Quantum-Si also allowed Bhuiya to install an email client on his personal iPhone so that he could access work emails remotely.

42.     Access to Quantum-Si's computer and email servers required multi-factor authentication, and Quantum-Si retained the ability to remotely shut off access to either.

**Bhuiya's Work in Quantum-Si's Research and Development**

43.    Bhuiya was based out of Quantum-Si's Guilford, Connecticut laboratory for the entire duration of his employment.

44.    Bhuiya often worked from his home office in Connecticut.

45.    Bhuiya worked in the Directed Evolution Group, which is itself a subgroup of the Protein Engineering Group. The mission of the Directed Evolution Group is to develop and screen for effective protein binders used to recognize amino acids in the process of protein sequencing.

46.    Bhuiya supervised one research scientist in the Guilford laboratory (the "Guilford research scientist") and, since February 2022, one research scientist based in the San Diego laboratory (the "San Diego research scientist").

47.    The Guilford research scientist was responsible for running yeast display experiments. The purpose of the yeast display experiments is to identify protein mutations that are beneficial to the development of effective protein binders. The proteins would be developed on the surface of yeast cells, hence the name "yeast display."

48.    The San Diego research scientist was responsible for running phage display experiments. The purpose of the phage display experiments is the same as that of yeast display experiments, but the proteins would be developed on the surface of bacteriophage viruses, hence the name "phage display."

49.    Bhuiya was not himself responsible for performing any experiments.

50.    Bhuiya would typically come to the Guilford laboratory for a few hours each morning, but would otherwise work from home.

51.    During Bhuiya's employment, the Directed Evolution Group also had a principal scientist and research scientist working from a Fredericksburg, Maryland-based laboratory (the "Fredericksburg principal scientist" and "Fredericksburg research scientist," respectively).

52.    Bhuiya was responsible for analyzing the data provided to him by the two research scientists that reported directly to him and, together with the Principal Scientist in Maryland, develop a library of potential protein binder candidates to be used in further experiments as part of an iterative process, the goal of which was to further the accuracy and power of Quantum-Si's protein sequencing technology.

53.    During Bhuiya's employment, the Directed Evolution Group also had a team based in Paris. The purpose of the Paris team's experiments was the same as that of the United States-based teams, but the Paris laboratory developed proteins on the surface of DNA molecules, as part of in-vitro experiments referred to as SNAP display experiments.

54.    The entire Directed Evolution Group would present the results of their experiments, and the results of their data analyses, in weekly meetings. In connection with those weekly meetings, the members of the Directed Evolution Group would prepare PowerPoint slide decks summarizing their work, and highlighting key findings. These presentation and meeting materials were key to the Directed Evolution Group's ongoing research and development efforts.

**Bhuiya Accepts Employment at Encodia**

55.    On July 23, 2022, Encodia made a written offer of employment to Bhuiya, to serve in the role of Senior Principal Scientist, Protein Engineering. According to the offer letter, Bhuiya's anticipated start date would be September 19, 2022.

56.     Encodia is Quantum-Si's most direct competitor because its technology currently under development ("ProteoCode") relies on the use of protein binders to recognize amino acids in the process of protein sequencing, as does Quantum-Si's product, Platinum.

57.     Encodia's offer letter to Bhuiya enumerated Bhuiya's job responsibilities. The responsibilities that Encodia set out for Bhuiya are the same as those Bhuiya's team held at Quantum-Si, and the first two are at the core of Quantum-Si's continued research-and-development into protein sequencing technology:

(a)     "Spearheading binder discovery and affinity maturation campaigns";

(b)     "Designing and implementing high-throughput experimental pipelines directed towards molecular evolution and engineering"

58.     Encodia is therefore a business "Competitive" with Quantum-Si, as that term is defined in Bhuiya's Agreement, because it engages in the research or development of processes, products or techniques or the production, manufacture, distribution or sale of any product (ProteoCode) similar to services performed or products produced, manufactured, distributed or sold by the Quantum-Si (Platinum) during the term of his employment with Quantum-Si.

59.     Bhuiya signed the Encodia offer letter on July 26, 2022.

60.     Bhuiya continued to work at Quantum-Si without disclosing his decision to accept an offer of employment from its competitor.

**Bhuiya Travels to Quantum-Si's San Diego Laboratory under False Pretenses**

61.     Shortly after accepting Encodia's offer of employment, Bhuiya asked his manager, Quantum-Si's Head of Research, for permission to travel to San Diego (at Quantum-Si's expense), purportedly to visit Quantum-Si's San Diego laboratory. Bhuiya's manager approved Bhuiya's travel request.

62.     Bhuiya traveled to San Diego from August 9, 2022 to August 14, 2022. Quantum-Si paid or reimbursed Bhuiya for his travel expenses.

63.     Bhuiya's August 2022 visit to the San Diego laboratory was the only visit he made there during his employment with Quantum-Si.

64.     While at the San Diego laboratory, Bhuiya asked the San Diego research scientist to demonstrate for him how she conducted the phage display experiments.

65.     Quantum-Si had hired the San Diego research scientist specifically for her experience conducting phage display experiments.

66.     It was not at all necessary for Bhuiya to know how to conduct a phage display experiment himself in order to perform his duties as a principal scientist in the Directed Evolution Group, or for any other work purpose.

67.     Bhuiya told the San Diego research scientist that he wanted to introduce phage display experimentation to Quantum-Si's other laboratories. He in fact never did so.

68.     In addition to working in the laboratory, Bhuiya met members of a different Quantum-Si team that were working on protein expression. This protein expression work was outside of the scope of Bhuiya's duties at Quantum-Si.

69.     While in San Diego, Bhuiya presented some data from the Directed Evolution Group's SNAP display experiments to the protein expression team. Bhuiya told the San Diego research scientist that he did this because, in sum and substance: "If you want to learn something from other teams, you have to present something from your own side." And the protein expression team did in fact present their work to Bhuiya. This presentation constituted Confidential Information, to which Bhuiya would not have had access but for the San Diego team's authorization.

70.     Upon information and belief, Bhuiya also met with Encodia employees during his company-funded trip to San Diego.

71.     Upon information and belief, Bhuiya used false pretenses to collect information from Quantum-Si's San Diego personnel, with the intent to use and disclose that information at Encodia, in furtherance of his and others' work there.

72.     Upon information and belief, Bhuiya has used and disclosed the information conveyed to him by Quantum-Si's San Diego personnel in furtherance of his work for Encodia.

**Bhuiya's Resignation and Misappropriation**

73.     On or about September 1, 2022, Bhuiya tendered his notice of resignation to his manager.

74.     Following Bhuiya's notice of resignation, the Guilford and San Diego research scientists continued to perform their experiments as they had before. Bhuiya did not transition any of his work to them prior to the end of his employment at Quantum-Si.

75.     Following Bhuiya's notice of resignation, the Fredericksburg principal scientist continued to perform her work as she had before. Bhuiya did not transition any of his work to her prior to the end of his employment at Quantum-Si.

76.     Rather than transition any of his work to a colleague, Bhuiya's colleagues adjusted reporting lines so that the research scientists who had reported to him now reported the results of their experiments to the Fredericksburg principal scientist.

77.     On September 14, 2022, Bhuiya had his exit interview with Quantum-Si's human resources officers. During his exit interview, Bhuiya refused to disclose his next place of employment.

78.    On the evening of September 14, 2022 – the day before his final day of employment at Quantum-Si – Bhuiya simultaneously accessed six files from his home IP address, while connected to the company's computer network from a MacBook laptop that had not been issued to him by Quantum-Si.

79.    The six files were authored by other members of the Directed Evolution Group, and were not Bhuiya's own work product.

80.    Bhuiya had no legitimate work reason for accessing these files on the evening before his final day of employment at Quantum-Si.

81.    Five of the six files Bhuiya accessed on September 14, 2023, taken together, identify mutations beneficial to effective protein binding along with their protein backbone. This information is the result of years of iterative experimentation on protein mutations as part of a directed evolutionary process, the goal of which is to make protein sequencing more accurate and more efficient.

82.    The identity of gene mutations beneficial to the development of effective protein binders are among Quantum-Si's most valuable trade secrets.

83.    The sixth file Bhuiya accessed on September 14, 2023 contained detailed instructions and comments on how to order gene clones from the Directed Evolution Group's preferred vendor. The file also contained notes regarding alternative vendors for particular types of gene clones.

84.    These instructions and comments constitute Confidential Information and trade secrets. They are not known to the public and derive significant strategic and economic value from their confidentiality.

15

85.     A competitor armed with the information contained in these six files would be able to more efficiently build a library of effective protein binders for further research and development without having to invest in the years of iterative experimentation that led to Quantum-Si's development of this information.

86.     Upon information and belief, Bhuiya used improper means to exfiltrate these, and other Quantum-Si files constituting Confidential Information and trade secret material onto his personal computing devices, external hard drives, and/or cloud-based accounts.

87.     Upon information and belief, Bhuiya misappropriated these files so that he could order Quantum-Si's most recent effective protein binders for Encodia, and get a head start on building out that competitor's library of effective protein binders to be used in its still-unreleased protein sequencing technology.

88.     On September 15, 2023, Quantum-Si cut off Bhuiya's access to its computer network.

89.     A subsequent forensic examination shows that, on September 16, 2023, a day after the end of his employment at Quantum-Si, Bhuiya attempted to log onto Quantum-Si's computer network from his home IP address, using a MacBook laptop not issued to him by Quantum-Si.

90.     Upon information and belief, Bhuiya would regularly print out copies of documents containing Quantum-Si's Confidential Information and trade secrets, from his home office, during the course of his employment.

91.     Bhuiya returned his Company-issued laptop and laboratory notebooks, but did not return any files downloaded onto the MacBook laptop that he used from his home IP address, the personal iPhone onto which Quantum-Si installed a work email client, or any hard copy files of Quantum-Si records in his possession.

16

92.     Bhuiya's September 14, 2022 access of files containing Quantum-Si's Confidential Information and trade secrets, along with his post-employment retention of computer files and tangible copies thereof, constitute breaches of Bhuiya's duty of loyalty and breach of his obligations under the Agreement, and were therefore misappropriation by improper means.

**Bhuiya's Use of Quantum-Si's Trade Secrets and Confidential Information at Encodia**

93.     On May 2, 2023, Bhuiya announced on LinkedIn that he had joined Encodia sometime ago, and that he is working on a product named ProteoCode. He also wrote: "After an incredible 7-year journey at Quantum SI, I've gained invaluable knowledge and experience from my colleagues," naming Quantum-Si's Head of Research as well as the Fredericksburg Principal Scientist – his counterpart in the Directed Evolution Group.

94.     ProteoCode is a technology for protein sequencing that, like Quantum-Si's Platinum product, relies on protein binders to identify and sequence amino acids.

95.     Encodia filed a trademark application with the U.S. Patent and Trademarks Office ("USPTO") for the name "ProteoCode" on January 19, 2019, for use in connection with: "Laboratory equipment and instruments in the nature of devices for molecular analysis of proteins and protein sequencing . . . ."

96.     In January 2021, Encodia received raised a $75 million Series C round of financing. A press release announcing the financing round stated: "The company intends to use the funds to accelerate productization of its patented ProteoCode™ platform for broad use in life science research and subsequent clinical applications." The press release also described ProteoCode as an "easy-to-use benchtop instrument."

97.     In October 2021, Encodia hired a new Chief Technology Officer, whom Encodia's Co-Founder and President stated would "advance the product in development to full commercialization."

98.     As of the date of Bhuiya's hire by Encodia in July 2022, Encodia had still not gone to market with its ProteoCode product.

99.     Indeed, as of July 2022, Encodia had provided almost no detail to the market on its operations or commercialization plans – a fact noted by the industry press at that time.

100.    By contrast, as of July 2022, Quantum-Si had already announced its plan to launch Platinum in the second half of 2022 – and in December 2022, it did.

101.    In his LinkedIn profile, Bhuiya states that he is: "Overseeing a protein discovery portfolio for developing a Next Generation protein sequencing platform." Bhuiya also cites "library design" and "display technology" among his responsibilities at Encodia, just as they were during his employment at Quantum-Si.

102.    Bhuiya is performing the same essential work at Encodia as he performed at Quantum-Si.

103.    Upon information and belief, Bhuiya misappropriated Quantum-Si's trade secrets so that he could use them to advance the productization of Encodia's competing product.

104.    Upon information and belief, Bhuiya disclosed Quantum-Si's Confidential Information to others at Encodia in order to advance the productization of Encodia's competing product.

## COUNT I

### BREACH OF CONTRACT

105.    Quantum-Si repeats and re-alleges each and every allegation stated in the preceding paragraphs of the Complaint as if fully set forth herein.

106.    Bhuiya's Noncompetition, Confidentiality and Intellectual Property Agreement (the "Agreement") is a valid contract supported by adequate consideration, and Quantum-Si has the authority to enforce that Agreement.

107.    Quantum-Si has performed all of its obligations under this Agreement and all other understandings with Bhuiya.

108.    Bhuiya breached Section 1(b)(i) of the Agreement by entering into the employment of Encodia, a company directly "Competitive" with Quantum-Si, as that term is defined in the Agreement, within one year following the termination of his employment with Quantum-Si.

109.    Bhuiya breached Section 2 of the Agreement by, upon information and belief, acquiring, using, disclosing, and making copies of Quantum-Si's Confidential Information (as that term is defined in the Agreement) outside the course of his employment with Quantum-Si and without Quantum-Si's prior written consent.

110.    Specifically, Bhuiya has disclosed, and will inevitably continue to disclose, Quantum-Si's Confidential Information to employees and agents of Encodia.

111.    Bhuiya breached Section 5 of the Agreement by failing to deliver to Quantum-Si all of the property belonging to Quantum-Si at the end of his employment that was in his possession, including but not limited to data stored on his personal computer and mobile phone, as well as hard copies of documents containing Quantum-Si's Confidential Information.

19

112.    Bhuiya continues to violate his contractual obligations, and will continue to violate these obligations in the future.

113.    As a consequence of the foregoing, Quantum-Si has suffered and will continue to suffer irreparable harm for which it lacks an adequate remedy at law, as well as present and future economic harm which is unascertainable at the present time.

## COUNT II

### MISAPPROPRIATION OF TRADE SECRETS BY DEFENDANTS

(Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. § 35-51 et seq.)

114.    Quantum-Si repeats and re-alleges each and every allegation stated in the preceding paragraphs of the Complaint as if fully set forth herein.

115.    The protein binder data and customized vendor instructions misappropriated by Bhuiya are highly valuable trade secrets as defined in the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. § 35-51, et seq. ("CUTSA").

116.    Quantum-Si's trade secrets are critical to Quantum-Si's competitive advantage over other businesses in the protein sequencing space.

117.    Quantum-Si has taken reasonable precautions to preserve the secrecy of the trade secrets known to Bhuiya.

118.    Bhuiya had access to Quantum-Si's trade secrets during his employment by Quantum-Si, and Bhuiya, did wrongfully acquire Quantum-Si's trade secrets after accepting a position with Encodia.

119.    Bhuiya's conduct constitutes the actual or threatened misappropriation, misuse, and/or inevitable disclosure or reliance upon Quantum-Si's trade secrets.

20

120.    Bhuiya has failed to protect or otherwise not use or disclose Quantum-Si's trade secrets.

121.    Bhuiya's conduct expose Quantum-Si to the disclosure, threatened disclosure, and/or inevitable disclosure of Quantum-Si's valuable trade secrets.

122.    Bhuiya's conduct as described above constitutes willful and malicious misappropriation by improper means of Quantum-Si's trade secrets in violation of CUTSA.

123.    Unless Bhuiya is enjoined from disclosing and utilizing Quantum-Si's trade secrets, Quantum-Si will continue to be immediately and irreparably harmed since its competitor has received, will continue to receive, and have the use of trade secrets developed and maintained by Quantum-Si and that are not generally known to the public; and Bhuiya can use such trade secrets to his and his employer's economic advantage, and to Quantum-Si's detriment, in competing unfairly with Quantum-Si.

124.    As a result of the threatened misappropriation and/or misappropriation of Quantum-Si's trade secrets by Defendants, Quantum-Si has suffered and will continue to suffer damages, as well as immediate and irreparable harm. Quantum-Si has no adequate remedy at law.

125.    As a direct and proximate result of Bhuiya's conduct, Quantum-Si is entitled to actual damages in an amount to be determined at trial. Bhuiya's acts and conduct were willful and malicious, justifying an award of punitive damages and attorneys' fees.

## COUNT III

### FEDERAL DEFEND TRADE SECRETS ACT
(18 U.S.C. §§ 1836 et seq.)

126.    Quantum-Si repeats and re-alleges each and every allegation stated in the preceding paragraphs of the Complaint as if fully set forth herein.

127.    Bhuiya's actions, as described above, constitute violations of one or more provisions of the DTSA.

128.    The DTSA applies because Quantum-Si's trade secrets are related to products and services used in, and intended for use in, interstate and foreign commerce, which are provided to customers across the United States.

129.    By engaging in the conduct described above, Bhuiya has misappropriated Quantum-Si's trade secrets related to a product or service used in, or intended for use in, interstate or foreign commerce.

130.    Quantum-Si has taken reasonable measures to keep the trade secret information secret.

131.    Quantum-Si's protein binder and customized vendor instruction trade secrets are sufficiently secret to derive independent economic value due to not being generally known to, and not being readily ascertainable through proper means by, other persons who could obtain economic value from the disclosure or use – including Quantum-Si's competitors, such as Encodia. A competitor with access to Quantum-Si's aforementioned trade secrets could use that information to avoid millions of dollars in research-and-development costs, and to unfairly diminish Quantum-Si's profits.

132.    Without authorization, Bhuiya has misappropriated trade secrets in a willful and malicious manner and with a deliberate intent to injure Quantum-Si and for his own and his employer's financial gain.

133.    Bhuiya owed duties to Quantum-Si to maintain the secrecy of the trade secrets and to limit the use of those trade secrets outside the scope of his employment. Bhuiya acquired the trade secrets by improper means and/or disclosed and utilized the trade secrets, or inevitably will

disclose and utilize the trade secrets, without Quantum-Si's consent, in order to improperly compete with Quantum-Si.

134.    Quantum-Si communicated the trade secrets to Bhuiya in confidence. At the time of disclosure, Bhuiya knew that the trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and limit the use of the trade secrets.

135.    Bhuiya and his employer can obtain economic value from the disclosure and use of Quantum-Si's trade secrets, for example, by avoiding the years, and millions of dollars in investment, that were required for Quantum-Si to develop the trade secrets, and to convert Quantum-Si's customers to his employer, for his own financial gain, and that of his employer.

136.    As a consequence of the foregoing, Quantum-Si has suffered and will continue to suffer irreparable harm, injury, and loss. Pursuant to the DTSA, actual or threatened misappropriation of trade secrets may be enjoined. Unless enjoined, Bhuiya will continue to use Quantum-Si's trade secret information to unfairly compete with Quantum-Si, and Quantum-Si will continue to suffer irreparable harm that cannot be remedied solely through monetary damages.

137.    As a direct and proximate result of Bhuiya's conduct, Quantum-Si is entitled to actual damages in an amount to be determined at trial. Bhuiya's acts and conduct were willful and malicious, justifying an award of exemplary damages and attorneys' fees.

### COUNT IV – STATUTORY THEFT
(Connecticut General Statutes Annotated § 52-564)

138.    Bhuiya knowingly received, took, or obtained and/or concealed Quantum-Si stolen property.

139.    Bhuiya's conduct, as described above, was done with the intent to deprive Quantum-Si of its property and/or to appropriate Quantum-Si's property for himself and for Encodia.

140.    The Quantum-Si data and documents retained by Bhuiya after the termination of his employment were and are Quantum-Si property over which Bhuiya has no right of possession.

141.    Bhuiya's wrongful retention and concealment of Quantum-Si's property violates Connecticut General Statutes § 52-564.

142.    As a result of Bhuiya's conduct, Quantum-Si has been injured.

143.    Bhuiya is liable to Quantum-Si for treble damages for civil theft pursuant to Connecticut General Statutes § 52-564.

## COUNT V – BREACH OF DUTY OF LOYALTY

144.    Quantum-Si repeats and re-alleges each and every allegation stated in the preceding paragraphs of the Complaint as if fully set forth herein.

145.    As a result of his employment with Quantum-Si, Bhuiya owed a duty of loyalty to Quantum-Si.

146.    As such, Bhuiya owed Quantum-Si a duty to act in its best interests.

147.    Bhuiya's unfaithful conduct – including the trip he took to Quantum-Si's San Diego laboratory under false pretenses – constitutes a willful breach of his duty of loyalty toward Quantum-Si.

148.    Consequently, Bhuiya has forfeited his right to the compensation he received from Quantum-Si during his period of disloyalty, running from at least as early as July 26, 2022 through September 15, 2022.

## PRAYER FOR RELIEF

WHEREFORE, Quantum-Si prays for the following relief:

1.    Permanent injunctive relief: (a) enjoining Bhuiya, Encodia, or any other third party to which Bhuiya disclosed Quantum-Si's Confidential Information or trade secrets from using or disclosing same; (b) ordering Bhuiya, Encodia, or any other third party to which Bhuiya disclosed or transferred Quantum-Si's Confidential Information or trade secrets to provide Quantum-Si with an accounting of the information and materials, electronic and/or in hard copy, taken, copied, downloaded or misappropriated by Bhuiya from Quantum-Si; (c) ordering Bhuiya to submit his computing devices (including any personal smart phones in his possession) and external media storage devices for independent forensic inspection and remediation to purge any copies of Quantum-Si's Confidential Information or trade secrets found thereon;

2.    Compensatory damages, in an amount to be determined at trial;

3.    Disgorgement of past compensation, in an amount to be determined at trial;

4.    Punitive or exemplary damages pursuant to 18 U.S. Code § 1836 and Connecticut General Statutes § 35-53;

5.    Treble damages pursuant to Connecticut General Statutes § 52-564;

6.    Quantum-Si's reasonable attorneys' fees and costs;

7.    A jury trial on all claims so triable; and

8.    Such other and further relief, legal and equitable, that this Court deems just and proper.

Dated at New Haven, Connecticut this 12th day of July, 2023.

Respectfully submitted,

/s/ *Maura Mastrony*

Maura Mastrony
LITTLER MENDELSON, P.C.
One Century Tower
265 Church Street, Suite 300
New Haven, CT 06510
Telephone: 203.974.8700
Facsimile: 203.974.8799
mmastrony@littler.com

Miguel A. Lopez
LITTLER MENDELSON, P.C.
900 Third Avenue, 8th Fl.
New York, NY 10022
Telephone: 212.583.9600
Facsimile: 212.832-2719
malopez@littler.com

Mark Romeo
LITTLER MENDELSON, P.C.
18565 Jamboree Road, Suite 800
Irvine, CA 92612
Telephone: 949.705.3000
Facsimile: 949.724.1201
mromeo@littler.com

## VERIFICATION

I, Christian LaPointe, PhD, General Counsel for Quantum-Si Incorporated ("Quantum-Si"), am the authorized representative of Quantum-Si for the purposes of verifying the foregoing Complaint. I have personal knowledge of the matters set forth in the Complaint or the information contained therein has been collected and made available to me by counsel and employees of Quantum-Si. I affirm that the factual information and statements made therein are true and correct to the best of my knowledge and belief.

_____
Christian LaPointe, PhD

STATE OF ~~CONNECTICUT~~ FLORIDA    )
                                     ) ss.:
COUNTY OF MIAMI DADE                 )

Personally appeared, Christian LaPointe, PhD before me and subscribed and swore to the foregoing on this 12TH day of July, 2023.

_____
Notary Public
My Commission Expires: 9/28/2024

Notary Public State of Florida
Stanley Moore
My Commission HH 844333
Expires 09/28/2024